IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COTTMAN TRANSMISSION | : | CIVIL ACTION |
| SYSTEMS, LLC ET AL., | : | NO. 05-6369 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| DALE KERSHNER ET AL., | : | |
| | : | |
| Defendants. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                                      MARCH 3, 2008

TABLE OF CONTENTS

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . 3

II.  BACKGROUND . . . . . . . . . . . . . . . . . . . . . . 3
     A.   Allegations in the Complaint . . . . . . . . . . 3
     B.   Procedural History . . . . . . . . . . . . . . . 5

III. MOTION TO DISMISS . . . . . . . . . . . . . . . . . . 7

     A.   Claims under Non-Pennsylvania State Law . . . . . . 8
          1.   Counts 4 & 5: California law . . . . . . . . . 9
          2.   Count 8: Florida law . . . . . . . . . . . 10
          3.   Count 39: Virginia law . . . . . . . . . . . 12
     B.   Counts 28 & 29: Common Law Fraud & Negligent
          Misrepresentation . . . . . . . . . . . . . . . 14
          1.   Parol evidence rule . . . . . . . . . . . . 15
          2.   Gist of the action doctrine . . . . . . . . 20
     C.   Count 30: Breach of Covenant of Good Faith
          and Fair Dealing . . . . . . . . . . . . . . . . 22
     D.   Count 31: Breach of Fiduciary Duty . . . . . . . 25
          1.   Advertising agreement . . . . . . . . . . . 27
          2.   Listing agent agreement . . . . . . . . . . 28
     E.   Count 32: Violation of the Robinson-Patman Act . . 30
     F.   Counts 33, 34 & 35: RICO Claims . . . . . . . . . 33
          1.   Count 33: § 1962(b) . . . . . . . . . . . . 34
          2.   Counts 34 & 35: § 1962(c) & (d) . . . . . . 37

-1-

G.   Claims of the California Franchisees  . . . . . . .  38

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . .  43

I.   INTRODUCTION

On February 13, 2008, the Court entered a memorandum and order addressing, in part, Cottman's motion to dismiss.  The Court's decision of the motion to dismiss Counts 4, 5, 8, 28 through 35, and 39 was postponed until after the parties had the opportunity to present oral argument on the motion.  This memorandum now takes up the postponed counts.  The motion to dismiss will be granted as to Counts 4, 5, 8, 28, 29, 32, 33, 34 and 35.  The motion to dismiss will be denied as to Counts 30, 31, 39, and as to the claims of John R. Bauguss, Transmission Systems, Inc., William Setiawan, Verned Corp., Marcos Gonzales, and Marcos & Patricia Gonzalez Enterprises, Inc.

II.  BACKGROUND

A.   <u>Allegations in the Complaint</u>

This case pits the former franchisees of Cottman Transmission System (the "Franchisees") against their franchisor and two related defendants, Ross Advertising, an advertising agent that is affiliated with Cottman, and Todd P. Leff, President and CEO of Cottman[1] (collectively, "Cottman").  The Franchisees allege that, rather than making a good faith effort to establish a chain of successful franchise stores, Cottman has

_____

[1]    Since the March 2006 merger of Cottman with AAMCO Transmissions, Leff has been President and CEO of AAMCO.

-3-

engaged in a nefarious scheme to "churn" franchises and profit at the Franchisees' expense.

Essentially, the Franchisees claim that Cottman lured prospective franchisees with false information about the success of Cottman stores and with false promises of support to make the franchises successful.  Once a franchisee signed on, Cottman failed to deliver the training and services it had promised. Moreover, the franchisee eventually learned that the information it had been given about other stores was untrue: the other stores were not as successful as Cottman had claimed.  Finally, Cottman waited until a franchisee was on the verge of bankruptcy, then swooped in, offering to buy out the franchisee for far less than the franchisee paid for the store.  After buying the store back at a discount, Cottman would begin the process again, reselling the store for its original sale price (or more) and making a large profit.

As part of the franchise agreement, the Franchisees were required to pay Cottman an advertising fee.  This fee was to be placed into individual accounts--one for each franchise store--and used by Ross Advertising to advertise the Cottman system. The Franchisees allege that Cottman charged them inappropriate and unauthorized commissions in connection with the expenditure of these advertising funds.

Finally, the Franchisees also allege that Cottman

-4-

agreed to act as a listing agent for certain Franchisees that decided to sell their franchise stores.  However, Cottman steered potential buyers away from stores being sold by Franchisees and toward stores owned by Cottman, maximizing its own profit at the expense of the Franchisees.

The Franchisees claim that this scheme violated the consumer protection laws and franchise laws of the states in which the franchise stores were located.  They further allege that Cottman is liable for common law fraud or negligent misrepresentation, breach of contract, breach of the covenant of good faith and fair dealing, and breach of fiduciary duty. Finally, they allege that Cottman's pattern of behavior violates several sections of the Racketeering Influenced and Corrupt Organizations Act ("RICO").

B.   <u>Procedural History</u>

Cottman filed this action on December 12, 2005, seeking a declaratory judgment regarding the rights of the parties under the franchise agreements executed by Cottman and each franchisee. Cottman's complaint grew out of a number of suits brought by franchisees around the country against Cottman.  To achieve uniformity and efficiency, Cottman sought to resolve all its disputes with franchisees in a single forum.

On June 25, 2007, the Court granted in part and denied

-5-

in part the Franchisees' motion to file what was styled as a

"second amended complaint."[2]   The Second Amended Complaint

replaced the complaint filed by Cottman and is the first document

in this case in which the Franchisees set forth their claims

against Cottman.  The Court denied the Franchisees' motion to

amend insofar as they sought to add claims that the Court

concluded were futile.  In particular, the Court concluded that

the Franchisees' claims under out-of-state (i.e., non-

Pennsylvania) consumer protection laws were futile because those

claims are barred by the choice-of-law provision in the franchise

agreement.  However, the Court allowed the Franchisees to assert

claims under the franchise laws of New York, California and

Wisconsin because those laws embody fundamental public policies

of those states and could not be barred by the choice-of-law

provision.  The Court also denied the Franchisees' motion to

substitute bankruptcy trustees for certain Franchisee parties.

The trustees had not yet received approval from the relevant

bankruptcy courts, making the motion to amend not yet ripe.

On September 12, 2007, the Franchisees moved to file a

---

[2]     The first complaint in this case was filed by Cottman
and listed the Franchisees as defendants.  Cottman's complaint
sought a declaratory judgment as to the parties' rights under the
contract and, in particular, sought to resolve claims that had
been brought by various of the Franchisees in different fora
around the country.  The Franchisees filed the second complaint
in the case to enumerate their claims against Cottman and clarify
the issues that would need to be resolved in resolving Cottman's
declaratory judgment action.

Third Amended Complaint in order to substitute as parties bankruptcy trustees who had received the necessary approval. This motion was granted except to the extent that the Franchisees sought to join parties on claims that the Court had already determined were futile.

Most recently, on February 13, 2008, the Court granted in part and denied in part Cottman's motion to dismiss.  Applying the conclusions of its June 2007 opinion, the Court held that claims under out-of-state consumer protection laws were barred by the parties' choice-of-law agreement and therefore must be dismissed.  On the other hand, the motion to dismiss was denied as to claims under out-of-state franchise laws, which the Court had already held were not affected by the choice-of-law agreement.  In its February 13 opinion, the Court reserved decision on claims not addressed in one of its earlier opinions. A hearing with the parties was held on February 22, 2008, and the Court turns to the remaining claims now.


III. MOTION TO DISMISS

In deciding a motion to dismiss for failure to state a claim upon which relief can be granted, the Court must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party."  <u>DeBenedictis v.</u>

Merrill Lynch & Co., Inc., 492 F.3d 209, 216 (3d Cir. 2007) (quotation omitted).  The Court need not, however, "credit either bald assertions or legal conclusions in a complaint when deciding a motion to dismiss."  Id. (quotation omitted).  Viewing the complaint in this manner, the Court must dismiss the complaint if it fails to state a claim upon which relief can be granted.

A.    Claims under Non-Pennsylvania State Law

The Franchisees assert claims under California consumer protection law (Counts 4 & 5), the Florida Franchise Law (Count 8), and the Virginia Retail Franchise Act (Count 39).  Cottman moves to dismiss these claims, arguing that each is barred by the parties' agreement that Pennsylvania law shall govern all disputes arising from the franchise agreement.  The Court's analysis of the motion to dismiss these claims is guided by the choice-of-law analysis set forth in its previous opinion in this case.[3]

> [T]he first question to be answered . . . is whether the parties explicitly or implicitly have chosen the relevant law.  Generally, if the parties have agreed to the applicable law, that agreed-upon law shall be given effect.  A choice-of-law clause may be invalidated, however, if (1) the chosen state has no substantial relationship

------

[3]    Pennsylvania law governs because, as a federal court sitting in diversity, this Court applies the choice-of-law rules of the state in which it sits.  St. Paul Fire & Mar. Ins. Co. v. Lewis, 935 F.2d 1428, 1431 n.3 (3d Cir. 1991) (citing Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941)).

-8-

> to the parties or the transaction, or (2) if
> application of the law of the chosen state would
> be contrary to a policy of a state with a
> materially greater interest than the chosen state
> in the determination of the particular issue.

Cottman, 492 F. Supp. 2d at 466 (citations omitted).  Factors

considered in determining whether enforcement of a choice-of-law

agreement would be contrary to a policy of another state are

whether a particular law contains an anti-waiver provision,

whether courts of the state have held that choice-of-law

provisions may avoid application of the law in question, and

whether enforcing the choice-of-law agreement would result in a

substantial erosion of the rights that the parties would have if

the choice-of-law agreement were not enforced.  Id. at 467-69.

        The Court has already determined that Pennsylvania has

a substantial relationship to the parties and transaction in this

case.  Id. at 467.  Therefore, the question with respect to each

out-of-state claim is whether enforcement of the choice-of-law

agreement and application of Pennsylvania law would be contrary

to a policy of the other state and whether that other state has a

materially greater interest in the determination of a particular

issue than Pennsylvania.


        1.   Counts 4 & 5: California law

        Counts 4 and 5 assert claims under the California

Unfair Competition Act, Cal. Bus. & Prof. Code §§ 17200 et seq.

The Court has already concluded that claims under this statute are barred by the parties' choice-of-law agreement because the Franchisees have not shown that application of the choice-of-law provision would be contrary to a "fundamental public policy" of California.  Id. at 472 n.7.  Therefore, the motion to dismiss Counts 4 & 5 will be granted.

       2.   Count 8: Florida law

     The application of the choice-of-law provision is not contrary to Florida public policy; therefore, the choice of Pennsylvania law will be enforced and this claim will be dismissed.  First, the Florida statute contains no anti-waiver provision.  Fla. Stat. § 817.416.  Parties operating under Florida law are free to contract away the protections of the statute.  Second, Florida courts that have considered the question have concluded that no Florida policy interest is damaged by allowing choice-of-law agreements to bar the application of the Florida Franchise Act.  E.g., Loehr v. Hot 'N Now, Inc., No. 95-6253 (S.D. Fla. Feb. 11, 1998); Hardee's Food Sys., Inc. v. Bennett, No. 89-8069, 1994 WL 1372628, at *5 (S.D. Fla. Mar. 24, 1994).

     Applying the choice-of-law agreement to bar the Florida claim may erode the Franchisees' ability to recover because there are significant differences between the Florida statute and

Pennsylvania common law.  For example, the Florida Franchise Act creates liability for a person who "intentionally misrepresents" the chances of a franchise's success when selling the franchise, without regard to whether the buyer relied on the misrepresentation.  Thus, the Franchise Act is more protective than Pennsylvania's doctrine of common law fraud which requires a claimant to prove justifiable reliance.  Moreover, successful claimants under the Florida Act may receive reasonable costs, including attorneys' fees, whereas parties at common law generally bear their own costs.

The erosion of protection effected by the choice-of-law provision does not, however, contravene a fundamental public policy of Florida.  Because the Franchise Act contains no anti-waiver provision, Florida franchisees may choose to contract around the Act.  In other words, Florida's policy is to provide a franchisee with as much protection as he or she contracts to receive.  By signing contracts containing a Pennsylvania choice-of-law clause, the Franchisees agreed to receive the amount of protection afforded by Pennsylvania law.  Enforcing this agreement does not undermine Florida policy.

Because applying the choice-of-law agreement is not contrary to Florida policy, the agreement will be enforced to preclude the Franchisees' claim under the Florida Franchise Act. The motion to dismiss Count 8 will be granted on this ground.

-11-

Therefore, the Court need not consider the additional grounds offered by Cottman to support the motion to dismiss Count 8.

### 3.   Count 39: Virginia law

The motion to dismiss Count 39, a claim under the Virginia Retail Franchise Act, will be denied.  The Virginia statute is similar in several important respects to the franchise statutes of California, New York and Wisconsin.  The Court has already held that the Franchisees may proceed with claims under these statutes.  The Court similarly concludes that applying Pennsylvania law to the exclusion of the Virginia claim would undermine the policy of Virginia and would cause a substantial erosion of the rights of the Franchisees.

Like the California, New York and Wisconsin franchise statutes, which the Court held to embody fundamental policies of those states, the Virginia franchise statute begins with a paragraph stating that it is the policy of Virginia "to correct as rapidly as practicable such inequities as may exist in the franchise system" and "to provide franchisees more direct, simple, and complete judicial relief against franchisors who fail to deal in a lawful manner with them."  Va. Stat. § 13.1-571.  Thus, Virginia "expressed a clear policy [of] provid[ing] a heightened degree of protection to . . . franchisees" vis-a-vis their franchisors.  Kershner, 492 F. Supp. 2d at 467.

-12-

Also like the California, New York and Wisconsin statutes, the Virginia statute contains an anti-waiver provision, which prevents franchisees from waiving the protections provided by the Retail Franchise Act.  Courts faced with similar anti-waiver provisions have held that the provisions prevent franchisees from waiving protection under the statute, even by signing a choice-of-law agreement.  Id. at 468.

Finally, there are "significant differences" between the laws of Virginia and Pennsylvania; choice of Pennsylvania law may cause a "'substantial erosion' of the quality of protection afforded under the other state's law."  Id. at 469 (applying this standard as part of the determination of whether a choice-of-law agreement should be enforced).  The Virginia Act authorizes private suits by franchisees "when there has been (1) an unlawful cancellation of a franchise; (2) undue influence to induce the surrender of a franchise right; and (3) when a franchise declares the franchise void."  Picture Lake Campground, Inc. v. Holiday Inns, Inc., 497 F. Supp. 858, 868 (E.D. Va. 1980); Va. Stat. § 13.1-571.

Under Pennsylvania common law, the Franchisees are protected by the duty of good faith and fair dealing if they demonstrate direct or indirect termination of their franchise relationships.  See infra part II.C.  However, Virginia law provides broader protection, also encompassing the use of "undue

-13-

influence to induce the surrender of a franchise right." <u>Picture Lake</u>, 497 F. Supp. at 868.  Moreover, if the Franchisees are successful, under the Virginia statute, they are entitled to attorneys' fees, § 13.1-571(a), whereas under Pennsylvania common law they will bear their own costs.

The Virginia Retail Franchise Act represents a fundamental policy of Virginia and the protections of the Act may not be waived.  Therefore, the motion to dismiss Count 39 will be denied.

B.   Counts 28 & 29: Common Law Fraud and Negligent
<u>Misrepresentation</u>

The Franchisees claim that Cottman made misrepresentations in its Uniform Franchise Offering Circular[4] ("UFOC") and that it also made false statements regarding the management of the Franchisees' advertising accounts.  They claim Cottman is liable for common law fraud[5] (Count 28) or, in the

---

[4]     Federal law requires franchisors to provide a UFOC to prospective franchisees during the negotiation of the sale of a franchise store.  Certain disclosures regarding the franchise system are required to be made in the document.

[5]     The elements of fraud under Pennsylvania law are: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance."  <u>Gibbs v. Ernst</u>, 647 A.2d 882, 889 (Pa. 1994).

-14-

alternative, negligent misrepresentation[6] (Count 29).  Cottman
argues that these claims should be dismissed because: 1) the
claims are barred by the "gist of the action" doctrine; 2) the
parol evidence rule bars the introduction of prior
representations to prove fraud in the inducement of a fully
integrated contract; and 3) promises to perform an act in the
future do not constitute actionable fraud under Pennsylvania law.
The parol evidence rule prevents the Franchisees from relying on
extrinsic evidence, including the UFOC, to establish their claims
of fraud in the inducement or negligent misrepresentation.
Furthermore, both claims related to the advertising accounts are
barred by the gist of the action doctrine.   Therefore, the
motion to dismiss Counts 28 and 29 will be granted.


        1.   Parol evidence rule

        The Franchisees claim that Cottman made
misrepresentations in its Uniform Franchise Offering Circular, a
document that was provided to each franchisee during negotiations

---

        [6]    Negligent misrepresentation requires "(1) a
misrepresentation of a material fact; (2) made by a representor
who knew or should have known of its falsity, or made the
misrepresentation without knowledge as to its truth or falsity;
(3) made by a representor with the intention that the other party
would rely on it; and (4) resulting in injury to the party acting
in justifiable reliance on the misrepresentation." Gibbs, 647
A.2d at 889.  Unlike fraud, negligent misrepresentation does not
require that the speaker know his words to be false; it requires
only that he fail to make a reasonable investigation of their
truth or falsity.  Id.

over the sale of a Cottman franchise store.  For example, the Franchisees allege that Cottman misrepresented the average profit made by franchise store owners, the number of Cottman franchise stores that had closed in the past, the experience necessary to operate a franchise, and the average sales of franchise stores. The allegation is not that Cottman made fraudulent promises or projections of the earnings of future franchises, but that Cottman inaccurately reported the data for past time periods, distorting the facts upon which the Franchisees based their decisions of whether to purchase Cottman franchise stores.

"Where the parties . . . have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement. . . . [U]nless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms and agreements cannot be added to nor subtracted from by parol evidence." Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 436 (Pa. 2004).  "Notably, while parol evidence may be introduced based on a party's claim that there was fraud in the execution of the contract, i.e., that a term was fraudulently omitted from the contract, parol evidence may not be admitted based on a claim that there was fraud in the inducement of the contract, i.e., that an opposing party made false representations

-16-

that induced the complaining party to agree to the contract."[7]
Id. at 437 n.26.

In Nicolella v. Palmer, Nicolella, a contractor, made a
bid for a job constructing an addition on a market.  248 A.2d 20
(Pa. 1968).  The bid was made on the basis of architectural plans
and specifications shown to Nicolella; the bid was solicited by
Palmer.  After the bid, two revisions to the plans were made and
Nicolella asked Palmer whether the revisions would materially
affect the bid.  Palmer assured him that they would not.  The

---

[7]    The Franchisees urge the Court to apply the rule of
Berger v. Pittsburgh Auto Equipment Co., 127 A.2d 334 (1956),
rather than the rule of Yocca.  They argue that, under Berger,
parol evidence is admissible to prove fraud in the inducement and
thereby void the contract.  It is true that Berger applied a less
strict version of the parol evidence rule than did later cases
like Yocca, Nicolella v. Palmer, 248 A.2d 20 (Pa. 1968), and HCB
Contractors v. Liberty Place Hotel, 652 A.2d 1278 (Pa. 1995).
However, the Berger rule has been expressly limited to cases
involving the sale of real property where the buyer would be
unable, upon visual inspection, to determine that the
representations of the seller were false.  HCB, 652 A.2d at 1280.
     Scholars have likewise recognized the adoption of the
Yocca-Nicolella rule, and noted the strictness with which the
parol evidence rule applies in this state.  See Eric A. Posner,
The Parol Evidence Rule, The Plain Meaning Rule, and the
Principles of Contractual Interpretation, 146 U. Penn. L. Rev.
533, 536 (1998) (noting that Pennsylvania applied a strict
version of the parol evidence rule from the 1920s to the 1950s,
wavered somewhat with cases like Berger from the late 1950s to
the 1970s, and then settled on the strict Nicolella-HCB rule).
Although the strict Nicolella rule may be seen as inviting
widespread fraudulent inducement, there is also a danger in the
more permissive Berger approach.  "Once one looks at extrinsic
evidence for fraud, however, it is easy for a party to gain
admission of all extrinsic evidence . . . . The fraud exception
swallows the parol evidence rule," and with it, one guarantee of
contractual stability.  Posner, supra.

complaint alleged that

> the defendant, Nicholas R. Palmer, wilfully,
> falsely and fraudulently told the plaintiff
> that no substantial changes had been made and
> that the original plans, which had been
> submitted to plaintiff and returned to
> Nicholas R. Palmer were not available, when in
> fact, the defendant . . . well knew that
> substantial changes had been made and that the
> plans were available and were being withheld
> deliberately from the plaintiff, all with the
> intent to fraudulently induce the plaintiff to
> enter into a contract, detrimental to
> plaintiff's interests.

<u>Nicolella</u>, 248 A.2d at 21.  As a result of the alleged
misrepresentation, Nicolella agreed to do the construction job
under the terms of his original bid.  Later, when he learned that
the revisions to the plans had made the project much more costly,
he challenged the contract as fraudulently induced.

The <u>Nicolella</u> Court held that the alleged prior
misrepresentations (to the effect that the plan revisions were
not material) could not be admitted to challenge the contract
under the parol evidence rule.  Nicolella had alleged fraud in
the inducement, but he had not alleged fraud in the execution.
Therefore, the parol evidence rule prevented him from introducing
parol evidence.

The allegations in this case are similar to those in
<u>Nicolella</u>.  Like Nicolella, the Franchisees allege that Cottman
made representations of fact regarding the past success of
franchises to induce the Franchisees to enter into franchise

-18-

agreements.  Now that the Franchisees have learned that those representations were false, they seek to introduce evidence of the representations to challenge the contract.  The Franchisees are barred from introducing such evidence because, like Nicolella, they have alleged only fraud in the inducement, not fraud in the execution.  Therefore, the motion to dismiss Count 28 will be granted.

The motion to dismiss Count 29, the Franchisees' claim for negligent misrepresentation, will also be granted.  To succeed on a negligent misrepresentation claim, the Franchisees will need to prove justifiable reliance on the misrepresentations made by Cottman.  Because of the merger clause, which states that the Franchisees were not relying on any representations made outside the contract, the Franchisees will be unable to do so.[8]

_____

[8]     The Franchisees cite Carousel's Creamery, LLC v. Marble Slab Creamery, Inc., a case from a Texas state court, for the proposition that a merger clause does not prevent a plaintiff from showing that he justifiably relied on a UFOC.  134 S.W.3d 385.  The Franchisees argue that, because the Federal Trade Commission has promulgated rules governing the disclosures made in a UFOC, prospective franchisees who receive the disclosures are entitled to rely on them for purposes of a negligent misrepresentation claim, notwithstanding a disclaimer of reliance in the franchise agreement.  However, this decision was based on an interpretation of the Texas parol evidence rule, which, unlike the Pennsylvania rule, does not bar claims of fraud in the inducement.  Id. at 395 (holding that, consistent with parol evidence rule, "a merger clause can be avoided based on fraud in the inducement") (internal quotation omitted).  This rule is directly at odds with the Pennsylvania parol evidence rule, which bars claims of fraud in the inducement when the parties executed an integrated contract.  The Franchisees have cited no cases suggesting that the Pennsylvania courts would create an exception

-19-

"[B]y signing the [franchise] agreement, which contained an integration clause stating that the terms of the [franchise] agreement superceded all of the parties' previous representations and agreements, [the Franchisees] explicitly disclaimed reliance on any such representations." Yocca, 854 A.2d at 502 (citing Sunquest Sys., Inc. v. Dean Witter Reynolds, Inc., 40 Supp. 2d 644, 654 (W.D. Pa. 1999) ("As a matter of basic logic, [plaintiff] cannot be said to have relied upon representations . . . excluded by the integration clause.")).  The motion to dismiss Count 29 will be granted.

> 2.   Gist of the action doctrine

In their brief, the Franchisees assert that their fraud claim rests on statements made by Cottman in relation to the advertising accounts, not just on statements made in the UFOC. Representations regarding the ad accounts are not barred by the parol evidence rule because they were made after the contract was signed; the parol evidence rule applies only to pre-contract negotiations and representations.

It is not obvious from the Complaint that the

---

to the rule for plaintiffs who relied on UFOCs, nor have they claimed that the FTC rules at issue provide them with a private right of action for violation of the rules.  This Court will apply Pennsylvania law as it has been articulated by Pennsylvania courts: the merger clause bars the Franchisees from claiming reliance on the UFOC.

Franchisees actually assert a fraud claim based on these advertising-related statements.  The language of Counts 28 and 29 appears to refer only to the statements made by Cottman to induce the Franchisees to purchase franchises.  However, even if the advertising statements were included, claims resting any misrepresentations made by Cottman regarding the advertising accounts are barred by the gist of the action doctrine.

The "gist of the action" doctrine "is designed to maintain the conceptual distinction between breach of contract claims and tort claims [by] preclud[ing] plaintiffs from recasting ordinary breach of contract claims into tort claims."[9] eToll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10, 14 (Pa. Super. Ct. 2002).  "[A] claim should be limited to a contract claim when the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied by the law of torts."  Id.  Thus, non-performance under a contract gives rise only to a claim for breach of contract.  However, an alleged breach of fiduciary duties by a majority party in a joint venture gives rise to a tort claim because the

---

[9]     Although the Pennsylvania Supreme Court has not adopted the "gist of the action" doctrine, numerous state and federal courts have predicted that it will.  E.g., Williams v. Hilton Group PLC, 93 F. App'x. 384, 385 (3d Cir. 2004) (non-precedential); Sunburst Paper, LLC v. Keating Fibre Int'l, Inc., 06-3959, 2006 WL 3097771, at *2 n.2 (E.D. Pa. Oct. 30, 2006); eToll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10, 14 (Pa. Super. Ct. 2002).

fiduciary duties between majority and minority partners flow from
broader legal principles than just the obligations agreed to in
the contract.  Id. (citing Bohler-Uddeholm Am., Inc. v. Ellwood
Group, Inc., 247 F.3d 79, 104-05 (3d Cir. 2001)).

   The duties of Cottman and Ross Advertising owed to the
Franchisees regarding the advertising accounts arise solely from
the contract.  The Franchisees have not shown that there was any
special or fiduciary relationship between the parties with regard
to these accounts.  See infra part II.D.  Thus, any mismanagement
of the accounts by Cottman or Ross gives rise to a breach of
contract claim.  However, tort claims based on the accounts are
barred by the gist of the action doctrine.


  C. Count 30: Breach of Covenant of Good Faith and Fair
    Dealing

   Cottman seeks the dismissal of Count 30 only insofar as
that count states a claim for the breach of the parties' covenant
of good faith and fair dealing; Cottman does not seek the
dismissal of the Franchisees' breach of contract claim.  Cottman
argues that Pennsylvania law imposes a duty of good faith and
fair dealing on franchisors only in the termination of a
franchise agreement, and not in the performance of such an
agreement.  However, even if Cottman is correct as to the
limitations of the good faith duty, the Franchisees have asserted
that Cottman acted in bad faith by "churning" its franchise

stores--essentially, by failing to provide promised services under the franchise agreement, thereby making it impossible for the franchisees to operate the stores and forcing the franchisees to sell their stores back to Cottman at a severe discount.  Such actions, if proven, constitute an indirect termination of the franchise agreement and fall within the established boundaries of the franchisor's duty of good faith and fair dealing.

"[T]he nature of a franchise agreement imposes a duty upon franchisors not to act arbitrarily in terminating the franchise agreement."  Atl. Richfield Co. v. Razumic, 390 A.2d 736, 742 (Pa. 1978).  Thus, a franchise relationship may be terminated by the franchisor only when consistent with "[the franchisee's] reasonable expectations, principles of good faith and commercial reasonableness," id. at 743, or where the termination is specifically provided for by the contract, Exxon Corp. v. Wilson, 434 A.2d 1229, 1232 n.9 (Pa. 1981).  The precise contours of the good faith duty in the franchise relationship have not been established by the Pennsylvania Supreme Court.  While some courts speculate that the Pennsylvania Supreme Court would limit the duty to termination cases, GNC Franchising, LLC v. Farid, 2006 WL 1878925, at *4 (W.D. Pa. July 6, 2006); others predict that the duty would be extended to all aspects of the franchise relationship, AAMCO Transmissions, Inc. v. Harris, 759 F. Supp. 1141, 1148-49 (E.D. Pa. 1991) (Pollak, J.); Bedrock

-23-

<u>Stone & Stuff, Inc. v. Mfrs. & Traders Trust Co.</u>, 2005 WL 1279148
(E.D. Pa. May 24, 2005).  The Pennsylvania Supreme Court has at
least indicated that the duty applies in cases "of direct or
indirect termination," with an example of indirect termination
being a "bad faith" effort "to force [franchisees] to abandon
their franchises."  <u>Witmer v. Exxon Corp.</u>, 434 A.2d 1222, 1227
(Pa. 1981).

        In another case involving Cottman, it was recently held
that indirect termination of a franchise relationship by the
franchisor's failure to provide necessary and promised support to
the franchisee, which forced the franchisee to close the store,
constitutes bad faith termination and is actionable under <u>Razumic</u>
and <u>Witmer</u>.  <u>Cottman Transmission Sys. v. McEneany</u>, 2007 WL
210094, at *9 (E.D. Pa. Jan. 19, 2007) (Rice, Mag. J.);
<u>Kuligowska v. GNC Franchising, Inc.</u>, 2002 WL 32131024 (W.D. Pa.
Nov. 25, 2002 (denying motion to dismiss where franchisee argued
that franchisor attempted to drive it out of business).  The
allegations in this case are closely similar to the allegations
in <u>McEneany</u>.  Both cases involve claims that Cottman secures
franchisees with promises of training and support and then
essentially abandons its franchisees to fend for themselves,
driving them to sell the franchise when, without Cottman's
support, they are unable to maintain a viable store.  Like the
<u>McEneany</u> Court, this Court concludes that the Franchisees'

allegations of indirect termination are sufficient to state a claim for breaching the duty of good faith imposed on franchisors by Razumic and Wittmer.  Therefore, the motion to dismiss the claim for breach of the covenant of good faith will be denied.[10]


D.   Count 31: Breach of Fiduciary Duty

Cottman moves for the dismissal of Count 31, arguing that there was no fiduciary relationship between Cottman and the Franchisees.  On the other hand, the Franchisees assert that Cottman owed them a fiduciary duty arising out of the agency relationship created by Cottman's agreement to handle the Franchisees' advertising needs.  Particularly, the Franchisees allege that "Defendants acted as agents for Plaintiffs with respect to purchasing and placing advertisement, management of Plaintiffs' advertising accounts, accounting for amounts spent on behalf of individual Plaintiffs by Defendant Cottman through its affiliate, Ross, and as to acting as the listing agent for the sale of certain Plaintiffs' franchises."  Compl. ¶ 219.

Franchise agreements do not give rise to confidential or fiduciary relationships between the parties.  AAMCO

_____

[10]   Because the Court concludes that the Franchisees have stated a claim for breach of the covenant of good faith within the bounds established by Razumic and Wittmer, the Court need not consider the parties' arguments about whether the duty of good faith might extend beyond termination to other aspects of the franchise relationship.

Transmissions, Inc. v. Harris, 759 F. Supp. 1141, 1147 (E.D. Pa. 1991); Bishop v. GNC Franchising, LLC, 403 F. Supp. 2d 411, 424 (W.D. Pa. 2005).  However, the Franchisees do not claim that their franchise agreements with Cottman gave rise to a fiduciary relationship.  Rather, they argue that Cottman's fiduciary duties spring from two sources: first, Cottman's agreement to purchase advertising on behalf of the Franchisees; second, Cottman's agreement to act as listing agent for certain of the Franchisees who sought to sell their franchise stores.

        "The law is clear in Pennsylvania that the three basic elements of agency are: 'the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking.'"  Basile v. H&R Block, Inc., 761 A.2d 1115, 1120 (Pa. 2000) (quoting Scott v. Purcell, 415 A.2d 56, 60 (Pa. 1980)).  "'Agency results only if there is an agreement for the creation of a fiduciary relationship with control by the beneficiary.'"  Id. (quoting Smalich v. Westfall, 269 A.2d 476, 480 (Pa. 1971)).  "The special relationship arising from an agency agreement, with its concomitant heightened duty, cannot arise from any and all actions, no matter how trivial, arguably undertaken on another's behalf.  Rather, the action must be a matter of consequence or trust, such as the ability to actually bind the principal or

alter the principal's legal relations." Id. at 1121.

        1.  Advertising Agreement

        The Licensing Agreement provides that the Franchisees shall pay to Cottman a weekly advertising fee. Licensing Agmt. ¶ 9a, Ex. 3 to Compl. Cottman agreed to use the money to produce, develop and publish advertisements. Id. ¶ 9b. The Agreement provided that all decisions regarding the geographic scope of the advertisements and the type of media used were solely within Cottman's discretion. Id. ¶ 9c. Furthermore, Cottman had the discretion to raise the advertising fee within certain limits, and had approval authority over any advertisements the Franchisees might use separate from the advertising purchased by Cottman. Id. ¶¶ 9e, 9f.

        The Franchisees claim that the Licensing Agreement created a fiduciary agent-principal relationship between Cottman and the Franchisees, however, they fail to allege any facts to support this claim. Rather than the Franchisees being principals with control over Cottman, it appears that Cottman had sole control over the use of the advertising fee. While the advertisements purchased by Cottman would benefit the Franchisees, they would also benefit Cottman by increasing awareness of its brand name. Thus, the relationship envisioned by the Licensing Agreement is not a fiduciary relationship in

-27-

which Cottman worked for the sole benefit of the Franchisees and under their control.  Rather, it was a relationship in which Cottman had control and made decisions for the mutual benefit of the parties.

The Franchisees argue that a fiduciary relationship was formed because Cottman had discretion over funds that the Franchisees could not easily supervise.  They further assert that, despite many requests for an accounting of the expenditure of the advertising fees, Cottman refused to make such an accounting.  However, these facts are insufficient to show a fiduciary relationship.  The Franchisees have failed to allege that they had an entitlement to supervise Cottman's expenditure of the funds or that Cottman had any duty to make an accounting to them.

Because the Franchisees' allegations are insufficient to support their claim of a fiduciary relationship based on the advertising agreement, Count 31 will be dismissed insofar as it rests on this relationship.

### 2.   Listing Agent Agreement

Paragraph 24(iv) of the Complaint alleges that "Cottman and certain Plaintiffs entered into listing agreement [sic] whereby Cottman expressly agreed to act as that Plaintiffs' exclusive sales agent."  Although the Complaint provides few

-28-

details, it appears that, pursuant to the listing agreement,
Cottman was to act as sales agent for Franchisees that wanted to
sell their franchise stores.  The Franchisees claim that this
listing agreement created a fiduciary relationship, which Cottman
then breached by failing to advise prospective purchasers that
the Franchisees' stores were available for purchase.  Instead,
Cottman steered prospective purchasers toward stores that it
itself owned, maximizing its own profit at the expense of
Franchisees.

These allegations state a claim for breach of fiduciary
duty: an agent-principal relationship was formed by the listing
agreement, in which Cottman agreed to act on the Franchisees'
behalf, and the fiduciary duty was breached when Cottman
disregarded its duty of loyalty and sought its own profit rather
than the Franchisees'.

At the hearing on February 22, 2008, counsel for
Cottman correctly pointed out that the Complaint does not
identify the Franchisees who entered into listing agreements with
Cottman.  Therefore, the Franchisees shall be directed to amend
their complaint to identify the Franchisees who are asserting
claims for breach of fiduciary duty arising from listing
agreements.

E.    Count 32: Violation of the Robinson-Patman Act

        The Franchisees allege that Cottman has entered into
contracts with vendors that provide the vendors with the
exclusive right to sell equipment, advertisements and other
services to the Franchisees in exchange for kickbacks paid to
Cottman.  The Franchisees argue that these kickbacks violate
section 2(c) of the Robinson-Patman Act of 1936, which provides
that

            It shall be unlawful for any person engaged in
            commerce, in the course of such commerce, to
            pay or grant, or to receive or accept,
            anything of value as a commission, brokerage,
            or other compensation, or any allowance or
            discount in lieu thereof, except for services
            rendered in connection with the sale or
            purchase of goods, wares, or merchandise,
            either to the other party to such transaction
            or to an agent, representative, or other
            intermediary therein where such intermediary
            is acting in fact for or in behalf, or is
            subject to the direct or indirect control, of
            any party to such transaction other than the
            person by whom such compensation is so granted
            or paid.

15 U.S.C. § 13(c).

        Section 2(c) has been held to encompass commercial
bribery claims of the sort alleged by the Franchisees.  See 2660
Woodley Road Joint Venture v. ITT Sheraton Corp., 369 F.3d 732,
737 (3d Cir. 2004).  However, Section 2(c) does not itself create
a private right of action.  Rather, "the private right of action
for a § 2(c) Robinson-Patman Act claim, as for all private
plaintiff antitrust rights of action, is provided by § 4 of the

-30-

Clayton Act."  Id. at 738.  To maintain an action under § 4, the Franchisees must do more than show an injury that is causally linked to a violation of § 2(c).  Id.  They "must also prove 'antitrust injury,' which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  Id.

Moreover, proof of an antitrust injury is only one of several components necessary to establish antitrust standing. The Third Circuit has enumerated five factors that are relevant to whether a party has antitrust standing: "(1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury . . .; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages." Barton & Pittinos, 118 F.3d at 181 (citing In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1165-66 (3d Cir. 1993)).

In 2660 Woodley, the Third Circuit considered facts and allegations almost identical to those in this case.  The plaintiffs in 2660 Woodley negotiated an agreement with Sheraton

Corporation under which Sheraton would manage the hotel owned by
plaintiffs.   Plaintiffs alleged that Sheraton employed a kickback
scheme in violation of Section 2(c):

> Sheraton negotiated large-volume discounts
> with vendors seeking to supply Sheraton-
> managed hotels.   Sheraton then required the
> vendors to add a surcharge to the price billed
> to the individual hotels for each purchase.
> However, the surcharge was not itemized, or
> even disclosed, on any bills or invoices that
> vendors sent to individual hotels.   Rather,
> the surcharge was remitted directly to
> Sheraton in the form of a 'rebate.'

369 F.3d at 735.

The Court of Appeals held that plaintiffs had failed to
establish antitrust standing for purposes of a Robinson-Patman
claim.   "Paying inflated purchasing prices to vendors, without
more" does not constitute "'an injury of the type the antitrust
laws were intended to prevent.'"   Id. at 738 (quoting Brunswick
Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)).
Moreover, even assuming that plaintiffs suffered an antitrust
injury, plaintiffs failed to establish antitrust standing because
there were "clearly 'more direct victims'" of the bribery scheme.
Id. at 741-42.   In particular, "[v]endors who may have been
prevented from selling goods to [plaintiffs] because they refused
to participate" in the bribery scheme were more direct victims of
the scheme and suffered injuries that were "much closer to the
kind of injury antitrust laws address."   Id.

The Franchisees attempt to distinguish their claim from

-32-

the claim of the Woodley plaintiffs by pointing out that the Franchisees were forced to charge their customers inflated prices because of Cottman's scheme and that the Franchisees were therefore less able to compete with other transmission repair stores.  However, the plaintiffs in Woodley must have faced a similar problem--either charge the customers more to cover Sheraton's fees or charge the customers market rates and accept smaller profits than competitors who were not burdened by the Sheraton scheme.  Moreover, even assuming the Franchisees have suffered an antitrust injury, they cannot avoid the conclusion that their customers, who were forced to pay higher prices, and vendors who may have been prevented from selling goods to the Franchisees because of refusal to participate in the scheme are both more direct victims of Cottman's behavior.  Like the plaintiffs in Woodley, the Franchisees have failed to establish antitrust standing and their claim under the Robinson-Patman Act will be dismissed.

F.    Counts 33, 34 & 35: RICO Claims

        The Franchisees assert three claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(b)-(d).  "RICO makes it unlawful to acquire or maintain control of an enterprise--broadly defined to include virtually any de facto or de jure association--through a pattern of criminal activity,

or to use such an enterprise to engage in a pattern of criminal activity." Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 789 (3d Cir. 1984) (citing 18 U.S.C. § 1962(b), (c)). "It is also unlawful to conspire to perform these acts. Id. (citing 18 U.S.C. § 1962(d)).

"In order to plead a violation of RICO, plaintiffs must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Lum v. Bank of Am., 361 F.3d 217, 223 (3d Cir. 2004). A pattern of racketeering activity is defined as two or more racketeering acts within a ten-year period. 18 U.S.C. § 1962(d). Racketeering acts include acts of mail fraud indictable under 18 U.S.C. § 1341 and wire fraud indictable under 18 U.S.C. § 1343.[11] See § 1962(1).

### 1.   Count 33: § 1962(b)

Section 1962(b) of Title 18 of the United States Code states that "[i]t shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

---

[11]   It is undisputed that the defendants are "persons" that may be held liable under RICO. See 18 U.S.C. § 1962(3) (defining "person" as "any individual or entity capable of holding a legal or beneficial interest in property").

In order to recover under this section, "a plaintiff must show
injury from the defendant's acquisition or control of an interest
in a RICO enterprise, in addition to injury from the predicate
acts.  Such an injury may be shown, for example, where the owner
of an enterprise infiltrated by the defendant as a result of
racketeering activities is injured by the defendant's acquisition
or control of his enterprise. . . . In addition, the plaintiff
must establish that the interest or control of the RICO
enterprise by the person is as a result of racketeering."
Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1190 (3d Cir.
1993)).

        The RICO enterprise alleged by the Franchisees is
composed of Cottman, Ross, and Cottman Communications.  The
Franchisees have failed to allege that any of these entities
gained control over the enterprise as a result of racketeering
activity.[12]  "It is not enough for the plaintiff merely to show
that a person engaged in racketeering has an otherwise legitimate

_____

        [12]      Indeed, because the corporate defendants are both
"persons" and "enterprises," it is not clear whether they could
be held liable under § 1962(b).  See Lightning Lube, Inc., 4 F.3d
at 1190 (recognizing that it is "difficult to understand how a
corporation can acquire or maintain an interest in itself through
a pattern of racketeering activity" and that 1962(b) may require
that the "person" and "enterprise" be distinct entities).  The
Court of Appeals has held that the "person" violating 1962(c)
must be distinct from the "enterprise," but has refrained from
deciding whether such a distinction is also required by 1962(b).
Id. (citing Hirsch v. Enright Refining Co., 751 F.2d 628, 633-34
(3d Cir. 1984), for 1962(c) holding).

interest in an enterprise.  Rather, it must be established firmly that there is a nexus between the interest and the alleged racketeering activities."  Id.  It is alleged that all three defendants engaged in racketeering activities.  However, it is not alleged that racketeering activities were used to gain control of an enterprise.

Furthermore, the Franchisees have failed to allege that they were injured by Cottman's acquisition of control over a RICO enterprise.  Even if the Franchisees could show that one of the defendants used racketeering to gain control of the enterprise, that acquisition of control could not have harmed the Franchisees, who had no interest in the RICO enterprise.  The Franchisees' only injuries flow from the predicate acts of mail and wire fraud allegedly engaged in by the Cottman parties.

In Lightning Lube, the plaintiff alleged that the defendant Witco engaged in racketeering activities such as mail and wire fraud to force Lightning Lube out of business.  The Third Circuit affirmed the dismissal of plaintiff's § 1962(b) claim, noting that, not only had the plaintiff not shown that Witco obtained an interest in a RICO enterprise through racketeering, but that the plaintiff's only injuries flowed from the acts of fraud that predicated plaintiff's RICO claim. Without injuries flowing from the acquisition of control in the enterprise, separate from the enterprise's other acts, plaintiffs

could not sustain a claim under § 1962(b).  Like the claim in
<u>Lightning Lube</u>, the Franchisees' claim under § 1962(b) will be
dismissed.


       2.   <u>Counts 34 & 35: § 1962(c) & (d)</u>

      The Franchisees agree with Cottman that, if their claim
for common law fraud is dismissed, their claim under 18 U.S.C. §
1962(c)[13] must also be dismissed.  The claim for common law fraud
is barred by the parol evidence rule and will be dismissed;
therefore, the claim under § 1962(c) will also be dismissed.

      Furthermore, the Franchisees' claim under § 1962(d)
will be dismissed.  Under Section 1962(d), "[i]t shall be
unlawful for any person to conspire to violate any of the
provisions of subsection (a), (b), or (c) of this section."  "Any
claim under section 1962(d) based on a conspiracy to violate the
other subsections of section 1962 necessarily must fail if the
substantive claims are themselves deficient." <u>Lightning Lube</u>, 4
F.3d at 1991.  Because the Franchisees have failed to state
claims under subsections (b) or (c), their claim under subsection
(d) must be dismissed.

---

    [13]   Section 1962(c) states that "[i]t shall be unlawful for
any person employed by or associated with any enterprise engaged
in, or the activities of which affect, interstate or foreign
commerce, to conduct or participate, directly or indirectly, in
the conduct of such enterprise's affairs through a pattern of
racketeering activity or collection of unlawful debt."

G.   <u>Claims of the California Franchisees</u>

Cottman moves the Court to dismiss or stay the claims of John R. Bauguss, Transmission Systems, Inc., William Setiawan, Verned Corp., Marcos Gonzales and Marcos & Patricia Gonzalez Enterprises, Inc. (the "California Franchisees").  Each of these franchisees owned and operated a franchise in California.  Each also executed a franchise agreement that, unlike the non-California agreements, contained an arbitration clause providing that:

> Cottman and [Franchisee] shall attempt to negotiate and settle any dispute, controversy or claim or cause of action (collectively "Dispute") arising out of or relating to this Agreement.  In the event the Dispute is not settled through negotiation, the parties shall file the dispute with the American Arbitration Association ("AAA") in Philadelphia, Pennsylvania. . . . The award of the arbitrator(s) shall be the sole and exclusive remedy between Cottman and [Franchisee] regarding claims, counterclaims, cross-claims, issues or accountings . . . .

In reliance on this provision, Cottman asks the Court to stay or dismiss the claims of the California Franchisees pending arbitration of the parties' disputes.

The Franchisees oppose the stay or dismissal of their claims, arguing that, through its participation in this litigation, Cottman has waived any right to arbitration it may have previously had.  The Franchisees also argue that the arbitration clause is unconscionable and therefore

-38-

unenforceable.[14]

A party to an otherwise valid and binding arbitration agreement may waive its right to arbitration by participating in litigation before a court rather than moving to compel arbitration.  See, e.g., Ehleiter v. Grapetree Shores, Inc., 482 F.3d 207 (3d Cir. 2007).  "Although waiver is not to be lightly inferred, we will not hesitate to hold that the right to arbitrate has been waived where a sufficient showing of prejudice has been made by the party seeking to avoid arbitration."  Id. at 223 (internal quotation omitted).  Whether a party has in fact waived its arbitration right by engaging in litigation is a matter for a court, not an arbitrator, to decide.  Id. at 221.

"[P]rejudice is the touchstone for determining whether the right to arbitrate has been waived by litigation."  Id. at 222.  To make this determination, courts consider a list of factors, including: 1) "the timeliness or lack thereof of a motion to arbitrate"; 2) "the degree to which the party seeking to compel arbitration has contested the merits of its opponent's claims"; 3) "whether that party has informed its adversary of the intention to seek arbitration even if it has not yet filed a motion to stay the district court proceedings"; 4) "the extent of its non-merits motion practice"; 5) "its assent to the [trial]

_____

[14]    The Court does not consider this argument because it concludes that Cottman waived any arbitration rights it may have had.

-39-

court's pretrial orders"; and 6) "the extent to which both parties have engaged in discovery."  Id.

A case involving the California Franchisees was originally filed in the District of Minnesota on December 14, 2005.  On February 9, 2006, Cottman filed a motion to dismiss or transfer the case, arguing, among other things, that the California plaintiffs were bound to arbitrate their claims.  On June 8, 2006, the Minnesota court denied the motion without prejudice and transferred the case to the Eastern District of Pennsylvania.  Once here, Cottman filed an answer that asserted the arbitration agreement as an affirmative defense.  However, it did not renew its motion regarding arbitration until August 10, 2007 despite its previous decision to seek arbitration of the California parties' claims.  Whether Cottman's motion, filed over a year after the case arrived here, is timely for purposes of the first Grapetree factor is questionable.

Moreover, in the time before its motion was filed, Cottman proceeded as though it intended to litigate the case in this Court.  For example, Cottman twice opposed motions to amend the complaint for substantive reasons that addressed the merits of the case.  Cottman specifically addressed claims under California consumer protection law and California franchise law and argued that those claims are barred by the parties' choice-of-law agreements.  However, Cottman never once mentioned the

-40-

parties' agreement to arbitrate.  Thus, the second <u>Grapetree</u>
factor--the degree to which the party seeking opposition has
already argued the merits of the case--may weigh against Cottman
slightly.

On the third <u>Grapetree</u> factor, whether Cottman notified
the Franchisees of its intent to seek arbitration before its
formal motion, the factor weighs in favor of granting Cottman's
motion.  Cottman moved to compel arbitration in Minnesota, it
asserted the arbitration clause in its answer in this case and it
moved to dismiss the California claims on the basis of the
arbitration agreement well before the discovery deadline in this
case.  Thus, the Franchisees have been on notice since the
answer, and particularly since the filing of Cottman's motion,
that Cottman sought arbitration.

Cottman's non-merits motion practice (the fourth
<u>Grapetree</u> factor) has not been extensive, however, the parties
have been working with a special master since February 21, 2007.
Thus, although discovery motions have not played an important
role, resources have been expended on discovery and Cottman has
assented to proceeding on a litigation track.  Thus, the fourth
factor suggests Cottman may have waived its arbitration rights.

Fifth, as noted above, Cottman has assented to the
Court's pretrial orders.  It attended an initial pretrial
conference on October 27, 2006; filed a Rule 26(f) report on

-41-

November 13, 2006 that suggested the use of a special master;
agreed to the appointment of a special master in February 2007;
proceeded with discovery; and generally has behaved as though it
intended to try the claims of the California Franchisees.
Cottman allowed the Court to expend valuable resources analyzing
the California Franchisees' claims in the context of the
Franchisees' motions to amend without ever suggesting that the
claims should be dismissed and arbitrated.

Sixth, the parties engaged in a great deal of discovery
before the motion to dismiss was filed.  As noted above, the
parties worked with a special master on discovery issues for six
months before the motion to dismiss was filed.  According to the
scheduling order, fact discovery, including depositions, will be
completed on March 18, 2008.  Third Scheduling Order, Oct. 30,
2007 (doc. no. 101).

The Court concludes that Cottman has waived its right
to arbitration.  Overall, Cottman's behavior has resulted in
prejudice to the California Franchisees on two fronts: first, the
Franchisees have "devoted substantial amounts of time, effort,
and money in prosecuting the action," and second, Cottman was
able to use the Federal Rules to conduct discovery that may not
have been available in the arbitration forum.[15]   Hoxworth v.

---

[15]    Furthermore, the California Franchisees suggest that if
their claims are dismissed now, they may be time-barred from
pursuing the claims in arbitration.

-42-

Blinder, Robinson & Co., 980 F.2d 912, 926 (3d Cir. 1992).
Moreover, Cottman's failure to raise the arbitration clause in
its two briefs opposing the motions to amend is inexplicable,
particularly since the briefs specifically raised other defenses
to claims by California Franchisees under California law, such as
the parties' choice-of-law agreement.

The motion to dismiss the claims of the California
Franchisees will be denied.


IV.  CONCLUSION

For the foregoing reasons, the motion to dismiss will
be granted as to Counts 4, 5, 8, 28, 29, 32, 33, 34 and 35.  The
motion to dismiss will be denied as to Counts 30, 31, 39, and as
to the claims of John R. Bauguss, Transmission Systems, Inc.,
William Setiawan, Verned Corp., Marcos Gonzales, and Marcos &
Patricia Gonzalez Enterprises, Inc.